THE FRIEDLANDER CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 23046.    Filed October 21, 1955.

*Waldo DeLoache, Esq.*, for the petitioner.
*Thomas N. Chambers, Esq.*, for the respondent.

WITHEY, *Judge:* This proceeding is before us under mandate from the United States Court of Appeals for the Fifth Circuit to redetermine deficiencies in accordance with the opinion of that court which appears at 216 F. 2d 757. As shown in our report at 19 T. C. 1197, filed in this proceeding when it formerly was before us, one of the issues presented was whether the income of the petitioner for 1943, 1944, and 1945 should include the income of Louis Friedlander & Sons, which the petitioner contended was a partnership and recognizable as such for tax purposes or, in the alternative, whether certain expenses incurred by the petitioner in 1943, 1944, and 1945 were allocable to the claimed partnership. We concluded that the enterprise was not to be recognized as a partnership for tax purposes and that the respondent's inclusion of its income in the income of the petitioner for 1943, 1944, and 1945 should be sustained. Having reached the foregoing conclusions it became unnecessary for us to consider or decide the alternative issues. On appeal by the petitioner, the Court of Appeals for the Fifth Circuit reversed our action in holding that the claimed partnership was not to be recognized as a partnership for tax purposes and in sustaining the respondent's inclusion of its income in the income of the petitioner for the above-mentioned years. It now becomes necessary to consider the alternative issues which were raised by an amended

answer filed by the respondent. These issues are whether, for the purposes of section 45 of the Internal Revenue Code of 1939, (1) the petitioner and Louis Friedlander & Sons, sometimes hereinafter referred to as the partnership, were owned or controlled directly or indirectly by the same interests during the period from July 1, 1943, to March 31, 1946, (2) an allocation should be made to the partnership of certain costs incurred by petitioner with respect to merchandise inventory which was transferred by petitioner to the partnership on or about July 1, 1943, and (3) an allocation should be made to the partnership of certain general and administrative expenses incurred by petitioner during the years 1943, 1944, and 1945.

### GENERAL FINDINGS OF FACT.

The petitioner, a Georgia corporation organized in 1929, has its principal place of business in Moultrie, Georgia.

Louis Friedlander, sometimes hereinafter referred to as Louis, was the sole proprietor of a dry goods store at the place of business of petitioner in Moultrie, Georgia, from about 1909 to 1911, when he and his brother formed a partnership to conduct the business. In 1926 the business was incorporated and upon the organization of petitioner in 1929 assets received by Louis as a stockholder in dissolution of that corporation were acquired by the petitioner. At all times since its organization, Louis has been president of petitioner.

In 1935 Louis transferred to each of his six sons, Irwin, Malvin, Max, Richard, Herman, and Jack Ira, without consideration, 125 shares of common stock of petitioner. A stock dividend paid in December 1941 increased the holdings of each of the transferees to 175 shares.

*Issue 1. Ownership and Control of Petitioner and the Partnership.*

### FINDINGS OF FACT.

Between June 30, 1943, and March 31, 1946, petitioner's outstanding capital stock consisted of 1,743⅕ shares of common stock which were held as follows:

| Name and title | June 30, 1943 | July 1, 1943 | Dec. 31, 1944 | Mar. 31, 1946 |
|---|---|---|---|---|
| Louis Friedlander, President | 420 | 420 | 420 | 420 |
| Irwin Friedlander | 175 | | | |
| Malvin Friedlander | 175 | | | |
| Max Friedlander | 175 | | | |
| Richard F. Friedlander | 175 | 175 | 175 | 175 |
| Herman Friedlander | 175 | 175 | 175 | 175 |
| Jack Ira Friedlander | 175 | 175 | 175 | 175 |
| I. B. Perlman, Vice President | 245 | 245 | 350 | 350 |
| B. M. Cohen | 2⅖ | 2⅖ | 2⅖ | 2⅖ |
| R. L. Powell, Sec. and Treas. | 1⅗ | 1⅗ | 1⅗ | 1⅗ |
| A. I. Halpert | 7 | 7 | 7 | 7 |
| United Investment Co. | | | 437 | 437 |
| Treasury stock | 17 | ¹ 542 | | |
| Total stock | 1,743⅕ | 1,743⅕ | 1,743⅕ | 1,743⅕ |

¹ Sold Dec. 31, 1944, at par, 105 shares to I. B. Perlman and 437 shares to United Investment Co.

Louis and Esther Friedlander are husband and wife. I. B. Perlman is a brother of Esther Friedlander and the husband of Fannie Perlman. R. L. Powell has been employed for many years by petitioner as secretary and treasurer and has been in active charge of keeping its books of account and other records. B. M. Cohen is a brother-in-law of I. B. Perlman and Esther Friedlander. A. I. Halpert was not related to Louis or to I. B. Perlman. From June 30, 1943, to March 31, 1946, the stock of United Investment Co. was owned as follows:

| Stockholder | Shares |
|---|---|
| Esther Friedlander | 28 |
| Irwin Friedlander | 18 |
| Malvin Friedlander | 15 |
| Max Friedlander | 14 |
| Louis Friedlander | 1 |
| Louis Friedlander, trustee for Herman | 12 |
| Louis Friedlander, trustee for Richard | 11 |
| Waldo DeLoache | 1 |
| Total | 100 |

United Investment Co. is primarily engaged in the real estate business but also does some financing and loans money to a limited extent. It owned a considerable amount of real estate, most of which is situated in Moultrie and includes the main store building of the petitioner and the Fair Store building. Louis is secretary and treasurer of the company.

For a number of years prior to June 30, 1943, the petitioner operated a general merchandise business in a number of towns located in Alabama and the southern part of Georgia. On June 30, 1943, the petitioner operated the following named stores located in the indicated towns:

| Name | Location |
|---|---|
| Friedlander Corporation | Moultrie, Georgia |
| Nettler's Hardware | Moultrie, Georgia |
| The Fair Store | Moultrie, Georgia |
| Smart Shop | Moultrie, Georgia |
| Friedlander's | Fitzgerald, Georgia |
| Perlman's | Dothan, Alabama |
| Famous | Andalusia, Alabama [1] |
| Fashion Shoppe | Douglas, Georgia |
| Fashion Shoppe | Thomasville, Georgia |
| Farmers Hardware | Tifton, Georgia |

[1] The stipulation includes this unit but it is not referred to in other evidence.

The Friedlander Corporation store operated as a department store. In addition to having a retail department and an appliance department it also had a wholesale department. Nettler's Hardware, a contiguous unit, was also operated as a department of the Friedlander Corporation store. The Fair Store was an outlet store and sold only

seconds and close-outs, mostly work clothes and shoes. It catered to the farm trade. The Smart Shop in Moultrie and the stores in Douglas and Thomasville were ladies' ready-to-wear shops. The stores in Fitzgerald and Dothan stocked wearing apparel, piece goods, household furnishings, luggage, and other merchandise which could be sold promptly at medium prices. Farmers Hardware in Tifton handled only hardware and houseware. Petitioner leased the buildings in which it operated the out-of-town stores. All of the stores operated by petitioner, except the Friedlander Corporation store, were exclusively retail operations.

Irwin, Max, and Malvin served in the Armed Forces during the following indicated periods:

| | |
|---|---|
| Irwin_____ | January 1943 to January 1946 |
| Max_____ | September 1942 to November 1945 |
| Malvin_____ | February 1943 to March 1946 |

About the middle of November 1945 Irwin and Max returned from the service on terminal leave. Irwin was born in 1916. Max was born in 1920. Malvin was born between Irwin and Max. At the time they entered the armed services, Irwin and Max each had had a number of years' experience in the business of the petitioner. Malvin was a musician and had devoted no time to petitioner's business.

On July 16, 1942, Irwin, Max, and Malvin executed an instrument which by its terms gave their father (Louis) general powers of attorney. In 1944 they executed supplemental powers which contained a general ratification of the acts of their father theretofore performed by him under the powers of attorney given him on July 16, 1942.

On or about July 1, 1943, Louis and I. B. Perlman and their wives and Irwin, Max, and Malvin (with Louis acting for him under power of attorney) executed an instrument by which they formed a partnership to conduct a general retail merchandise business under the name of Louis Friedlander & Sons. The interest of Louis and I. B. Perlman and their wives in the assets and profits and liability for losses was 10 per cent each, and 20 per cent each for Irwin, Max, and Malvin. Under the instrument Louis was made business manager and treasurer of the partnership with full authority to make purchases, incur obligations, obtain loans, secured or unsecured, according to his judgment, and do any and all other acts incident and necessary to the conduct of the business of the partnership.

On or about July 1, 1943, Louis, acting under the general powers of attorney, sold to the petitioner at its par value of $17,500 the 175 shares of stock Max, Malvin, and Irwin each held in the petitioner and delivered the amounts received for the stock to the partnership as loans from his sons. The sales of the stock and the loans were part of the plan to organize the partnership.

The partnership purchased as of July 1, 1943, for $111,718.90 the assets and assumed the liabilities of the stores belonging to the petitioner, except the Friedlander Corporation, Nettler's Hardware, and Famous stores.

Apart from treasury stock Louis and I. B. Perlman by reason of their ownership of a majority of the stock of petitioner were in control of petitioner. Louis as president of the petitioner exercised administrative control of its affairs. During the absence of Max, Irwin, and Malvin while away in the service, Louis, as business manager and treasurer of the partnership and pursuant to the authority conferred on him in that capacity by the partnership agreement, managed and directed the affairs of the partnership and with the assistance of I. B. Perlman conducted the partnership business.

The petitioner and the partnership were owned or controlled directly or indirectly by the same interests during the periods pertinent hereto.

### OPINION.

The respondent takes the position that the record establishes that from July 1, 1943, to March 31, 1946, the petitioner and the partnership were owned or controlled by the same interests for the purposes of section 45 of the 1939 Code.[1] In support of his position, the respondent relies upon, among others, *Grenada Industries, Inc.*, 17 T. C. 231, affd. (C. A. 5) 202 F. 2d 873, certiorari denied 346 U. S. 819. The petitioner, on the other hand, contends that the evidence shows that it and the partnership were not owned or controlled by the same interests as contemplated by section 45. In support of its position, the petitioner relies upon, among others, *John L. Denning & Co.* v. *Commissioner*, (C. A. 10) 180 F. 2d 288, modifying a Memorandum Opinion of this Court.

Since the respondent did not determine that the petitioner and the partnership were owned or controlled by the same interests during the periods in question and since the issue of whether they were so owned or controlled was raised by an amended answer, the respondent has the burden not only with respect to that issue but also as to the other issues raised by the amended answer.

During the period from July 1, 1943, the date of the formation of the partnership, to December 31, 1944, Louis and his sons, Richard,

---

[1] SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

Herman, and Jack Ira, owned a total of 945 shares in the petitioner. During the same period I. B. Perlman owned 245 shares. Aside from treasury stock, the respective amounts represented approximately 80 per cent and 20 per cent respectively, of the petitioner's stock. On December 31, 1944, petitioner sold the 542 shares of its stock theretofore held as treasury stock. I. B. Perlman purchased 105 shares and United Investment Co. purchased the remaining 437 shares. Louis, Esther, Irwin, Max, and Malvin•Friedlander owned 76 per cent of the stock in United Investment Co. and Louis, as trustee, held 23 per cent. Clearly, Louis and the foregoing members of his family controlled either directly or indirectly the 437 shares of stock in petitioner acquired by United Investment Co. Consequently, from December 31, 1944, until March 31, 1946, the Friedlander family owned or controlled 1,382 shares of stock in. petitioner and Perlman owned 350 shares. These amounts represented approximately 79 per cent and 20 per cent, respectively. Throughout the period from July 1, 1943, to March 31, 1946, Louis and members of his family, namely, his wife, Irwin, Max, and Malvin owned an 80 per cent interest in the partnership and I. B. Perlman and his wife owned a 20 per cent interest. Except for the slight variation in stock ownership of the Friedlander family in the petitioner subsequent to December 31, 1944, the stock ownership in the petitioner and the ownership of interests in the partnership at all times from July 1, 1943, to March 31, 1946, were maintained by the Friedlander and Perlman families in the ratio of 80 to 20.

As of July 1, 1943, the time of the formation of the partnership, Louis and I. B. Perlman were in control of petitioner, and Louis as president exercised administrative control of its affairs. That situation continued until the end of the last of the periods in controversy. Beginning with the formation of the partnership and during the absence of Max, Irwin, and Malvin, while away in the service, Louis as business manager and treasurer of the partnership managed and directed the affairs of the partnership and with the assistance of I. B. Perlman conducted the partnership business.

In the *Grenada Industries, Inc.,* case, the stock of the two corporations, National and Industries, was owned by the J. A. Goodman family, the L. L. Goodman family, the Henry V. Kobin family, and Abraham J. Barskin in the percentages of 35, 35, 20, and 10, respectively. With a minor and immaterial exception the same percentage interests were applicable to the ownership of interests in two partnerships, Hosiery and Abar. Although during the years involved the record ownership of the stock and the partnership interests were not at all times in the same persons or the same family trusts, the 35–35–20–10 ratio (representing the proportionate interests of the Goodman and Kobin families and Barskin in relation to each other)

was at all times maintained and the actual control at all times material, represented by those interests, was exercised by J. A. Goodman, L. L. Goodman, Kobin, and Barskin. In holding that the corporations and the partnerships were owned or controlled directly or indirectly by the same interests, we said at page 254:

> Section 45 speaks in sweeping terms. It refers to "two or more organizations, trades, or businesses (whether or not incorporated, * * * and whether or not affiliated) owned or controlled directly or indirectly by the same interests." The type of control contemplated by these provisions is reflected in the regulations which deal with the concept in all-embracing language as follows (Regulations 111, sec. 22.45–1 (3)):
>
> "The term 'controlled' includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise. * * *"
>
> It is wholly unimportant that the Goodman trusts which owned stock in National and Industries were not the same Goodman trusts which were the record partners in Hosiery and Abar. The significant thing is that each of the two Goodmans in fact exercised control that was commensurate with the holdings of his family, and that Kobin in fact exercised control commensurate with the holdings of his family. We have no doubt that all four organizations were "owned or controlled directly or indirectly by the same interests." Cf. *Forcum-James Co.*, 7 T. C. 1195, 1215–1216.

In our opinion, what we said in the *Grenada Industries, Inc.*, case is applicable and controlling here. Accordingly, we have concluded and found as a fact that petitioner and the partnership were owned or controlled directly or indirectly by the same interests during the periods pertinent herein.

In *John L. Denning & Co.* v. *Commissioner, supra,* a question presented was whether the taxpayer, a corporation, and a partnership were owned or controlled by the same interests within the purview of section 45. John L. Denning was president of the taxpayer and owned approximately 58 per cent of its stock. Denning's wife, son, and daughter owned approximately 16½ per cent of its stock and the remaining 25½ per cent of the stock was owned by others. On October 1, 1943, Denning's wife, son, and daughter formed a partnership in which each owned a one-third interest. Denning, acting under a power of attorney from his son, who was away in the service, participated in the formation of the partnership. In addition to exercising control over the corporation, Denning exercised control over the partnership. Taking the view that Denning's control over the partnership was based on the family relationship and not on his ownership of partnership interest and since only approximately 16½ per cent of the taxpayer's stock was owned by persons owning an interest in the partnership, the court concluded that section 45 was inapplicable.

Since it appears to us that our holding in the *Grenada Industries, Inc.*, case is in accordance with the Congressional intent expressed in section 45, we must respectfully decline to follow the holding of the Court of Appeals in the *Denning* case.

*Issue 2. Allocation to Partnership on Account of Merchandise Inventory Conveyed by Petitioner to Partnership.*

### FINDINGS OF FACT.

Included in the assets purchased by the partnership from the petitioner as of July 1, 1943, was the merchandise inventory in the stores which were purchased as of that date. Such inventory was conveyed by petitioner at a price of $91,273.81. That amount represented the invoice price to the petitioner of such merchandise and did not include any amount for freight-in, buyer commissions, or other purchasing costs. The transaction occurred during a period of slow sales and about the time when sales of seasonal goods at reduced prices would be necessary in order to dispose of much of such merchandise preparatory to acquiring merchandise for the following season. Taken as a whole, the merchandise inventory was sold to the partnership at its full fair value.

### OPINION.

In his amended answer the respondent takes the position that by selling the merchandise in question at its inventory cost to the petitioner, the petitioner was not compensated for various expenses such as freight-in, insurance, handling costs, and general purchasing costs incurred by it in connection with such merchandise and that pursuant to the provisions of section 45 an amount equal to not less than 10 per cent of the selling price, or $9,127.38, should be allocated to the partnership in order to prevent evasion of taxes and to clearly reflect income. The petitioner contends that the merchandise inventory was sold to the partnership at its full value and that therefore no allocation to the partnership is required in order to properly reflect income. We have found as a fact that taken as a whole the merchandise inventory was sold to the partnership at its full fair value. In such a situation we fail to see how the partnership could have been expected to pay any more for the merchandise whatever might have been its cost to the petitioner. Under the circumstances, we think the respondent has failed to discharge his burden on this issue. Accordingly, we sustain the petitioner.

*Issue 3.  Allocation to Partnership of Portions of Petitioner's General and Administrative Expenses for 1943, 1944, and 1945.*

FINDINGS OF FACT.

The petitioner and the partnership used the same office as their respective main offices.  The office was in the building occupied by the petitioner's Friedlander Corporation store in Moultrie.  For the use of the building the petitioner paid an annual rent of approximately $3,000.  The petitioner paid the rent for the entire building.  The fair rental value of the portion of the building occupied by the office was $300 a year.  The furniture and fixtures in the office were owned by the petitioner.  The petitioner paid for the light, water, and fuel used in the building, including the office.  Of the sums incurred by petitioner for rent, light, water, and fuel and the depreciation of furniture and fixtures during 1943, 1944, and 1945, the amounts of $210, $310, and $240, respectively, were allocable to the partnership on account of its use of the joint office.

When the partnership was formed, a set of books was installed for it and thereafter it and the petitioner kept entirely separate sets of books.  The various partnership stores prepared and mailed out their own statements and to a substantial extent handled their own bookkeeping, including the bookkeeping relating to their accounts receivable and their collections.  Some of the partnership bookkeeping was done in the joint office in Moultrie by persons employed and paid by petitioner and who also rendered bookkeeping and clerical services to the petitioner.  Of the sums paid such persons during 1943, 1944, and 1945, respectively, the amounts of $1,450, $3,450, and $2,300, respectively, were allocable to the partnership on account of their services.

The petitioner paid for office supplies, postage, etc., used by it and the partnership in the joint office.  Of the sums paid for such purposes during 1943, 1944, and 1945, the amounts of $275, $285, and $235, respectively, were allocable to the partnership as its share of such expenses.

During 1944 and 1945 the petitioner paid for hospital insurance covering its employees, including those who did some partnership bookkeeping, and also employees at two of the partnership's stores.  Of the amounts so paid for those years, $40 for each of the years was allocable to the partnership on account of its employees and the employees of the petitioner who did bookkeeping work for the partnership.

During 1943, 1944, and 1945 the petitioner had 2 telephone lines in its Friedlander Corporation store and 5 or 6 extensions.  The foregoing telephones were used for both the petitioner's business and the

partnership's business. The petitioner paid the rent on the telephones and the charges for the long distance calls made over them. It also paid the charges on telegrams relating to the two businesses. Of the sums paid for such purposes during 1943, 1944, and 1945, the amounts of $140, $160, and $130, respectively, were allocable to the partnership.

In the years 1943, 1944, and 1945 the petitioner made expenditures for legal and accounting or auditing services for itself and for the partnership. Of the expenditures thus made, the amounts of $1,090, $990, and $645, respectively, were allocable to the partnership on account of such expenditures made in its behalf.

The managers of the partnership stores bought from 75 per cent to 85 per cent of the merchandise requirements of their stores. Most of such requirements were bought locally or from traveling representatives of the trade. The manager of the partnership's hardware store bought substantially all the requirements of his store locally or from traveling representatives. Louis and I. B. Perlman made trips each year to markets to purchase merchandise for the petitioner and the partnership. On occasions one or more managers of the partnership's stores accompanied Perlman to select merchandise for their particular stores. The petitioner used the services of resident buyers to purchase merchandise. One of the buyers rendered service in connection with merchandise purchased for the petitioner and for the partnership.

During the fiscal years ended June 30, 1944, June 30, 1945, and the period ended March 31, 1946, the partnership purchased merchandise at wholesale from the petitioner in the amounts of $77,493.32 (exclusive of opening inventory), $84,215.58, and $84,413.70, respectively, or a total of $245,122.60.

The foregoing sales were made at prices which were 5 per cent above the invoice cost to petitioner, without adjustment for discount taken by petitioner in connection with the purchase of the merchandise. Such discount averaged about 2.68 per cent. Sales of similar merchandise were generally made by petitioner at prices computed in the same manner to others who purchased from it at wholesale. The petitioner's total sales at wholesale for the years 1943, 1944, and 1945 were $424,657.71, $123,012.08, and $95,372.25, respectively, or a total of $643,042.04.

OPINION.

In his amended answer the respondent alleged that during the year ended December 31, 1943, the petitioner incurred general and administrative expenses in the amount of $44,318.87; that included among these expenses were office rent, depreciation on office furniture and fixtures, office salaries, office supplies, utilities, travel and buying, buyers'

expenses, general purchasing expenses, and other administrative expenses, a substantial part of the benefit of which went to the partnership and was furnished by the petitioner without consideration; that these expenses were deducted in their entirety on the 1943 income tax return of the petitioner; and that in order to prevent evasion of taxes and to clearly reflect income, not less than 25 per cent, or $11,079.72, of these expenses should be allocated to the partnership. Aside from admitting that it incurred general and administrative expenses in the amount stated by the respondent, the petitioner in its reply denied the allegations of respondent.

Similar allegations were made in the amended answer with respect to the years 1944 and 1945, except that it was stated that the general and administrative expenses were $31,965.06 for 1944 and $28,531.20 for 1945 and that 50 per cent of the former amount, or $15,982.53, and 50 per cent of the latter amount, or $14,265.60, should be allocated to the partnership. Except for admitting that it incurred general and administrative expenses in the amounts stated by the respondent for the respective years, the petitioner denied the allegations in its reply.

On brief the respondent contends that allocations of general and administrative expenses totaling $8,035.43 for 1943, $12,400.95 for 1944, and $10,135.44 for 1945 should be made to the partnership. The petitioner contends that we should conclude from the record that the respondent has not shown that the allocations proposed in his amended answer or on brief are proper.

In our Findings of Fact we have set out the amounts of the various expenses incurred by petitioner during 1943, 1944, and 1945, which, we think from a consideration of the evidence, were properly allocable to the partnership for the respective years.

The respondent has proposed that approximately $2,700, $5,100, and $4,200 of travel and buying and buyers' expenses incurred by petitioner in 1943, 1944, and 1945, respectively, be allocated to the partnership. We are unable to find from the record that any portion of the expenses of those classes incurred by petitioner in the respective years related to any merchandise acquired by the partnership other than that which the partnership purchased from the petitioner and all of which was purchased at wholesale. Sales made at wholesale by the petitioner to the partnership, as well as to others, were made at a mark-up of 5 per cent. In addition, the petitioner retained the discounts allowed on such merchandise which averaged 2.68 per cent. So far as shown, the total of the mark-up and discounts was at least ample to cover all the expenses incurred by petitioner in connection with such sales, including the expenses for travel and buying and for buyers which the respondent proposes should be allocated to the partnership.

The respondent also has proposed allocations of certain other expenses incurred by the petitioner. We are unable to sustain any of these allocations. As to some of them, the record shows that the expenses in question were exclusively for the benefit of the petitioner. As to the remainder, the record not only fails to disclose a factual basis which supports the allocations proposed by the respondent but also fails to disclose any basis upon which proper allocations could be made.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

RAUM, *J.*, concurring: This case closely parallels *Grenada Industries, Inc.*, 17 T. C. 231. There, as here, the Commissioner sought to disregard certain partnership entities. We held in *Grenada* that the partnerships were real and could not be ignored. The holding of the Court of Appeals in the present case is to the same effect. We were then faced with the problem in *Grenada* whether the existence of common control between the partnerships and related corporations resulted in any distortion of income that could be corrected by section 45. That is the problem that is now before us in the present case. We held in *Grenada* that the common control required by section 45 was present because the control represented by the various interests involved was in fact exercised by the fathers and husbands who actually operated the enterprises. We pointed out, however, that the mere existence of common control was not sufficient to justify the application of section 45, that there must be, in addition, distortion of income, and that section 45 can be applied only to the extent of correcting the distortion; we thereupon disapproved some of the corrections proposed by the Commissioner and approved others. A comparable situation is present here. The requisite common control exists here in fact as it did in *Grenada;* the mere existence of the common control, however, is not sufficient to justify the application of section 45; and I concur in the result reached by the Court in approving and disapproving the various corrections proposed by the Commissioner under section 45. The result is fully consistent with the prior decision of the Court of Appeals herein, which had previously affirmed our decision in the *Grenada* case. 202 F. 2d 873 (C. A. 5).